## UNITED STATES DISTRICT COURT OF THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREW STEGMEYER & AMANDA BRINTON, *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> ABM INDUSTRIES INCORPORATED, FLASHPARKING, INC. & PARKPLIANT, LLC, <br><br> Defendants. | Case No. 1:24-cv-0039 <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Andrew Stegmeyer and Amanda Brinton ("Plaintiffs"), through their attorneys, bring this Class Action Complaint against Defendants ABM Industries Incorporated ("ABM"), FlashParking, Inc. ("FlashParking") and ParkPliant, LLC ("ParkPliant") (collectively "Defendants"). Plaintiff's allegations are based upon personal knowledge as to themselves and their own acts, and upon information and good faith belief as to all other matters based on the investigation conducted by Plaintiff's attorneys.

### INTRODUCTION

1. This is a privacy class action lawsuit against Defendants for knowingly obtaining statutorily protected personal information—including names, addresses and telephone numbers—from the Illinois Department of Motor Vehicles, and other departments of motor vehicles (DMV"), in violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725 ("DPPA").

2. Defendants' scheme begins at the parking lots run by Defendant ABM. Specifically, at the parking lot adjacent to the Regal City North movie theatre in Chicago, Illinois run by ABM, the lot is left open without a gate that would prevent drivers from entering or exiting

without paying. At the entrance there is a small sign informing drivers that they need to use a mobile phone app or a kiosk in the movie theatre to pay for parking but it would be easy for drivers to miss this sign—especially because—prior to February 1, 2023—parking at this lot was free.

3.      If a driver does miss the posted signs regarding payment, or becomes confused as to where and when to pay, and instead drives out of the open lot without paying, ABM, together with Defendants FlashParking and ParkPliant, illegally harvests that driver's personal information from motor vehicle records to send harassing text messages and mailers in an attempt to charge outrageous parking fees and extortionate "penalty" charges.

4.      In order to attempt to collect these unlawful and unwarranted amounts, ABM employs license plate recognition technology provided by FlashParking to capture the license plates of each of the drivers who drive on and off ABM's parking lots.  ABM and FlashParking then disclose the captured license plate numbers to Defendant ParkPliant to knowingly and unlawfully obtain individuals' vehicle registration information.

5.      Acting together, Defendants ABM, FlashParking and ParkPliant, obtain  protected personal information including names, addresses and telephone numbers of Plaintiffs and Class Members, from non-public motor vehicle records in violation of the DPPA.

6.      Defendants then disclose and use that personal information to send Plaintiffs and Class Members text messages to which they did not consent and to mail them surprise bills they never consented to pay—doubling, tripling and even quadrupling the charges within weeks of the initial demand.

7.      The DPPA prohibits Defendants from knowingly obtaining personal information— such as "name," "address," "telephone number" and other information that identifies individuals— from motor vehicle records, including information from the DMV.  Defendants knowingly and

without authorization obtained such information of Plaintiffs and members of the Class in violation of the DPPA.

8.      Plaintiffs seek, on behalf of themselves and each member of the proposed Class, statutory damages under the DPPA in the amount of $2,500, reasonable attorney's fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines appropriate, including injunctive relief in the form of a prohibition on Defendants obtaining, using and disclosing personal information obtained from the DMV to send surprise bills through the mail and via text messages.

## PARTIES

9.      Plaintiff Andrew Stegmeyer is a natural person and citizen of Illinois, residing in Chicago, Illinois, where he intends to remain.

10.      Plaintiff Amanda Brinton is a natural person and citizen of Illinois, residing in Chicago, Illinois, where she intends to remain.

11.      Defendant ABM Industries Incorporated is a Delaware Corporation with its principal place of business at One Liberty Plaza, 7th Floor, in New York, New York 10006. ABM maintains Chicago offices at 180 N. Lasalle St., Ste. 1700 in Chicago, Illinois 60601.

12.      Defendant, FlashParking, Inc., is a Texas Corporation with its principal place of business at 1999 Bryan St., Ste. 900 in Dallas, Texas 75201.

13.      Defendant, ParkPliant, LLC, is a Delaware limited liability company with one manager-member, Kevin Adolph. Upon information and good faith belief, Mr. Adolph is a resident and citizen of Massachusetts. ParkPliant is headquartered at 7901 4th St. N, Ste. 300 in St. Petersburg, Florida 33702.

## JURISDICTION & VENUE

14.     This Court additionally has "federal question" jurisdiction given the claims alleged by Plaintiffs. This Court also has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

15.     This Court has personal jurisdiction over Defendants because they do substantial business in this state, and the events leading to this action took place in this state.

16.     Venue is proper because a substantial part of the alleged wrongful conduct and events giving rise to the claims occurred in this District and because defendants conduct business in this district.

## FACTUAL ALLEGATIONS

### A.  *Background of the DPPA*

17.     To protect the privacy and safety of licensed drivers, and to limit misuse of the information contained in these government record systems, Congress, in 1994, enacted the DPPA. The Act imposed strict rules for collecting the personal information in driver records and provides for liability in cases where an entity improperly collects, discloses, uses or sells such records. *See generally* 18 U.S. Code § 2721, et al.

18.     The DPPA safeguards this personal information from disclosure by state DMVs or acquisition by a third party for any purpose other than the limited permissible purposes expressly delineated in the DPPA.

19.     In creating special protections for data in this particular context, the DPPA responded to concerns over the personal information captured and retained by State motor vehicle

records. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records; "[u]nlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records. *See* 140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); *ibid.* (statement of Rep. Moran).

20. Personal information protected by the DPPA "means **information that identifies an individual**," which may "include[e] an individual's photograph, social security number, driver identification number, **name**, **address** (but not the 5-digit zip code), **telephone number**, and medical or disability information . . . " that is obtained "in connection with a motor vehicle record." 18 U.S.C § 2725(3) (emphasis added); 18 U.S.C § 2721(a)(1).

21. "Motor vehicle record" is defined to include "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles[.]" 18 U.S.C § 2725(1).

22. Further to 18 U.S.C § 2724, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains."

23. The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information. Those 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran).

24.     Notably, the DPPA does not list or identify any specific prohibited uses; rather, it generally prohibits all but the fourteen permissible uses enumerated in §2721(b).

25.     As detailed herein, none of those permissible uses apply to Defendants' uses as alleged herein.

26.     Indeed, §§ 2721(a) and 2722(a) make nondisclosure of personal information the default rule. *See* 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). §2721(b) then lists the fourteen discrete exceptions to non-disclosure, exceptions that, again, do not and cannot apply here.

27.     The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under § 2721(b). *See* 18 U.S.C. § 2724(a); 18 U.S.C. § 2722(a) ( "It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title.").

**B.  *Defendants Obtain, Use & Disclose Personal Information in Violation of the DPPA***

28.     ABM is a publicly traded corporation with $7 billion in annual revenue that owns and operates parking lots across the country.[1]  ABM has been providing parking lot management and parking services since 1966 and is considered a leader in the parking and transportation industries.  It has collected $1.5 billion in parking revenue for their clients.[2]

---

[1] *See* ABM's "About Us" page at https://www.abm.com/about/ (last accessed Oct. 27, 2023).

[2] *See* https://locations.abm.com/il/chicago/parking-transportation.html (last accessed January 3, 2024).

29.     As part of their parking services, ABM uses ABMVantage, a "data-enabled, driver-first smart parking platform that leverages data from parking systems, online booking, license plate recognition, and other technologies."[3]

30.     As ABM admits, its use of license plate recognition technology is being used for the "optimization of revenue on a per-spot basis" because "Wall Street is watching [and] Investors are discovering one of America's most tangible, durable, and necessary commodities—parking."[4]

31.     In its "Automated License Plate Recognition (ALPR) Usage and Privacy Policy," ABM admits that it collects drivers' license plate information by "by taking a photo of a license plate and recording the location, date and time of the photo, which is then saved electronically and temporarily stored."[5]

32.     However, ABM promises that it "only captures the letters and numbers of a license plate and does not connect the name of the owner of the vehicle with the license plate unless specifically authorized or submitted by the owner of the vehicle."[6]  Contrary to its Privacy Policy, ABM provides the license plate numbers it collects to Defendant FlashParking to then cross reference those plate numbers with vehicle registration data.[7]  ABM lists the reasons for which it

---

[3] *See* https://www.abm.com/cptresource/transforming-the-parking-experience-with-smart-parking-technology/ (last accessed January 3, 2024).

[4] *See* "Putting Parking in its Place" https://www.abm.com/wp-content/uploads/2023/02/ABM-Article-J-Feinberg.pdf (last accessed January 3, 2024).

[5] *See* "ABM Parking Services Automated License Plate Recognition (ALPR) Usage and Privacy Policy," https://www.abm.com/wp-content/uploads/2019/12/ALPR-Policy-FINAL-.pdf (last accessed January 3, 2024).

[6] *Id.*

[7] *See* "State investigates privacy concerns at Chicago movie theater parking garage," https://www.cbsnews.com/chicago/news/theater-parking-garage-privacy-concerns/ (last accessed January 3, 2024).

collects license plate information but it does not disclose that it uses and shares the license plate numbers it collects to obtain personal information from motor vehicle records in order to send surprise bills to drivers who use ABM parking lots.

33.    Launched in 2011, Defendant FlashParking is a parking technology company with a cloud-based platform that offers parking "solutions" that help parking lot owners "increase revenue" and "improve the parker experience:"[8]



**What is a PARCS Parking System?**

A PARCS (Parking Access and Revenue Control System) is a technology solution that manages and controls access to parking facilities with hardware and software. It includes license plate recognition cameras, payment processors, traffic control, and a centralized system, to track and bill vehicles, increase revenue, and improve the parker experience.

34.    FlashParking provides an "ungated parking system" that it promises will "increase revenue collection and improve accountability."[9]  FlashParking admits that its "ungated solutions utilize our LPR plus Signature technology, ensuring accurate visibility of your parking lots or parking garage asset, no matter the scenario."[10]

35.    Importantly, FlashParking uses a "cloud-born parking enforcement helps you improve revenue management with a range of enforcement options."[11]

---

[8] *See* https://www.flashparking.com/products/parking-revenue-optimization/access-and-revenue-control/ (last accessed January 3, 2024).

[9] *See* https://www.flashparking.com/products/parking-revenue-optimization/ungated-parking-garage/ (last accessed January 3, 2024).

[10] *Id.*

[11] *Id.*

36.     In order for FlashParking's promised enforcement to work, Defendants ABM and FlashParking partner with ParkPliant,[12] a Florida-based LLC that specializes in providing parking "compliance services."  ParkPliant touts that from a "traditional letter mailing to our proprietary real time texting service, we can help convert your non-compliant parkers to repeat customers."[13]

37.     To provide those services, ParkPliant advertises that it will source and provide "DMV" records to partners like AMB and FlashParking, allowing them to "convert" their "non-compliant parkers."[14]



---

[12] *See* "State investigates privacy concerns at Chicago movie theater parking garage," https://www.cbsnews.com/chicago/news/theater-parking-garage-privacy-concerns/ (last accessed January 3, 2024).

[13] *See* ParkPliant's About Us at: https://parkpliant.com/ (last accessed Oct. 27, 2023).

[14] *Id*.

38.     ParkPliant advertises on its homepage that it has "***automated DMV access" to 43 states***.[15]  It also promises that it can "***match up to 80% of consumers with a valid cell phone***" and that "***most consumers will receive a text within 15 minutes of notification***." (emphasis added)[16]

39.     In employing its scheme, Defendants used the license plate numbers they obtained through Automated License Plate Recognition technology to directly obtain, disclose and use personal information of Plaintiffs and Class Members from DMVs, including the Illinois state motor vehicle records.

40.     The Illinois state government never agreed to provide Defendants this information; in fact, they vehemently deny that the information was ever sold or shared with them, as reported by news outlets: "Again, the Illinois Secretary of State's Office adamantly denied selling data to a parking company. In fact, a spokesperson called the texted fines 'extremely problematic.'"

41.     The use is "problematic" because Defendants misuse driver records under no permissible purpose under the DPPA. Indeed, Defendants have never claimed they use driver records from state DMV officers under any permissible purposes.

42.     In response to this unlawful debt collection activity, consumers have been flooding online review boards about Defendants' misconduct, a sampling of which is below:



★☆☆☆☆ 4 months ago
This place is a scam! Can I give no stars? Let's start with the parking garage. The garage gate arms have been broken for years implying that the parking is free. After going recently, I get a text message the next day from the parking garage that I owe $80!!!



★☆☆☆☆ 2 months ago
Only went here because Barbie was sold out everywhere else. Parking is a complete scam - no transparency or easy way to pay, then you are hit with a text the next day for an $80 fine. One bathroom was closed and the other

---

[15] *Id.*

[16] *Id.*

⭐ ☆ ☆ ☆ ☆   4 months ago

Beware of the parking.  I've been coming to regal for years.  I was never a big fan of the long concession lines and dirty bathrooms but the $80 Parking fine has pushed me over the edge.  It's been free parking for the past few years and now with no gates or tickets to receive they send me texts messages saying i owe $80.  My last time ever going to this place

Second, the parking was $2 with tickets. Then the tickets went away and parking was free. Next the gate arms went away for both entry and exit. One would think parking was still free. Nope. Apparently they've contracted with someone (ABM) but the signage is minimal in the garage which is otherwise unchanged from its filthy state with broken glass. There's still no signage or arms at the entrance or exit, but apparently it's not free. Like other reviewers noted, if you reasonably assume parking is free as it has been for a year, then you'll get a notification via text (how do they have my number?) or mail with a fine of $80!! Beware. I'm sure we aren't the first and won't be the last to get screwed over by this subpar theater. I'd be better off going to the AMC New City.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Stegmeyer*

43.    Mr. Stegmeyer is a victim of Defendants' scheme.   Defendants unlawfully identified him by obtaining his Personal Information from state motor vehicle records without his consent in order to surprise him with bills for parking he never agreed to pay.

44.    For 15 years, Mr. Stegmeyer has visited the Regal City North movie theater. Over the past several years, ABM has not charged to park outside the Regal theater and before that, Mr. Stegmeyer paid just $2 to park.

45.    In or about June 2023, Mr. Stegmeyer visited the Regal City North and parked in the open, gateless lot without paying, just as he had for the past several years. Mr. Stegmeyer saw

no warning that he would need to pay a fee nor any reasonable notice that he may be charged if he parked in the lot.

46.     Months later, Mr. Stegmeyer received a collection notice addressed from Defendant ABM that was mailed to his home address and claimed that he owed $60 for a parking charge. Mr. Stegmeyer received in the mail at his home address several follow-up letters claiming that those fines had more than quadrupled to $260. The Letters threatened to report him to collections if he did not pay.

47.     The letter mailed to his address included his name, address, license plate number, the make of his motor vehicle, identified the Regal Theatre parking lot as the location upon which he incurred his parking fine and included a picture of the rear of his motor vehicle taken at the entrance of the Regal Theatre parking lot that clearly displayed his license plate and license plate number.

48.     Mr. Stegmeyer never provided Defendants the personal information needed to identify him by name and address.  These letters acted as an intrusion upon Mr. Stegmeter's seclusion, an invasion of his privacy, and caused Mr. Stegmeyer great distress.

***Plaintiff Brinton***

49.     Plaintiff Ms. Brinton is also a victim of Defendants' scheme.   Defendants unlawfully identified her by obtaining her Personal Information from state motor vehicle records without her consent in order to surprise her with bills for parking she never agreed to pay.

50.     For 15 years, Ms. Brinton has visited the Regal City North movie theater. Over the past several years, ABM has not charged her for parking outside the theater. Before that Ms. Brinton paid just $2 for parking.

51.     In June 2023, Ms. Brinton visited the Regal City North and parked without paying,

just as she had for the past several years. Ms. Brinton saw no warning that she would need to pay a fee nor any reasonable notice that she may be charged if she parked in the lot.

52.     Within days, Ms. Brinton received text messages with links claiming that she owed $80 for parking:



53.     When the link included in the text message is clicked, it takes you to the webpage below, which includes Defendant ABMs logo at the top, the date and time when and Regal Theatre location where Ms. Brinton parked and Ms Briton's license plate number:



54.     When the link entitled "View Photos" is clicked, photos of Ms. Brinton's motor vehicle are displayed, including close-up photos of Ms. Brinton's license plate:



55.     Ms. Brinton also received in the mail, addressed to her home address, a follow-up letter claiming that those fines had doubled to $160 and threatening to report her to collections if she did not pay.

56.     On or about September 5, 2023, Ms. Brinton received another letter mailed to her home address purporting to be from a law firm, "Collect Park," increasing the fine to $240 and threatening to take further action if she did not pay. These texts and letters acted as intrusions upon Ms. Brinton's seclusion and caused her great anxiety and distress.

57.     Both of the letters mailed to her home address included her name, address, license plate number, the make of her motor vehicle, identified the Regal Theatre parking lot as the location upon which she incurred the parking fine and included a picture of the rear of her motor vehicle taken at the entrance of the Regal Theatre parking lot that clearly displayed her license plate and license plate number.

58.     Ms. Brinton never provided Defendants the information needed to identify her by name and address and never provided Defendants with her telephone number. These letters and texts acted as an intrusion upon Ms. Brinton's seclusion, an invasion of her privacy, and caused Ms. Brinton great distress.

59.     Defendants' misconduct has harmed Plaintiffs and Class Members, including by invading their privacy in sending harassing texts and letters, violating their rights under the DPPA to conduct a harassing debt collection campaign, and harmed them emotionally by misusing their protected information—including their names, addresses, and telephone numbers—to threaten them with collection actions.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated (the "Class"), defined as follows:

> All individuals residing in the United States who had their personal motor vehicle records, maintained by a State Motor Vehicle Department, directly obtained, used, redisclosed and/or resold by Defendants for purposes not permitted by the DPPA.

Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

61.     Plaintiffs reserve the right to amend the class definition.

62.     This action satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23.

63.     **Numerosity**. Plaintiffs are representative of the proposed Class, consisting of hundreds, if not thousands, of individuals whose motor vehicle records were accessed by Defendants, far too many to join in a single action;

64.     **Commonality**. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

1)      whether Defendants collected Plaintiff's and the Class's personal information;

2)      whether Plaintiff's and the Class's personal information was contained in a motor vehicle record;

3)      whether Defendants unlawfully obtained and used Plaintiff's and the Class's personal information in violation of the DPPA;

4)      whether Defendants' actions were committed knowingly; and

5)    The nature and extent of all statutory penalties or damages for which Defendants are individually liable to Plaintiffs and Class Members, and;

6)    Whether punitive damages are appropriate.

65.    **Typicality**. Plaintiffs' claims are typical of those of the Class because Plaintiffs—like all members of the Class—had their personal motor vehicle records, maintained by a State Motor Vehicle Department, directly obtained, used, redisclosed and/or resold by Defendants for purposes not permitted by the DPPA.

66.    **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

67.    **Superiority**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically

impractical and impose a burden on the courts.

68.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

69.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

70.     Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

**COUNT I**
**Violations of the Driver's Protection Privacy Act**
**18 U.S.C. § 2721,** *et seq.*
*(against all Defendants)*

71.     Plaintiffs incorporate and reallege the above factual allegations by reference.

72.     The Driver's Privacy Protection Act, 18 U.S.C. § 2721(a), *et seq*., prohibits a person or organization from knowingly obtaining or disclosing personal information, or highly restricted personal information contained in motor vehicle records for any purpose not specifically permitted

under 18 U.S.C. § 2721(b).

73.    Defendants violated 18 U.S.C. §2721, *et seq.*, by intentionally obtaining, using, re-disclosing and/or reselling Plaintiffs and Class Members' motor vehicle records without knowledge, consent or authorization for purposes not specifically permitted under the act.

74.    Plaintiffs and Class Members are individuals within the meaning of 18 U.S.C. §2725(2).

75.    The names, addresses, telephone numbers and other information that Defendants obtained from motor vehicle records pertaining to Plaintiffs and Class Members was "personal information" as defined under 18 U.S.C. §2725(3).

76.    The contents of Plaintiffs' and Class Members' records obtained by Defendants constitute a "motor vehicle record," because they contain records that "pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles," within the meaning of 18 U.S.C. §2725(1).

77.    Defendants were not authorized recipients under 18 U.S.C. § 2721(c).

78.    Defendants are liable directly and/or vicariously for failing to use reasonable care to investigate permissible uses when re-disclosing and reselling Plaintiffs' and Class Members' motor vehicle records.

79.    Defendants knowingly used the personal information it obtained from the motor vehicle records to send text messages and to mail collection letters to Plaintiffs and Class Members' home address in an attempt to collect parking fees and penalties.

80.    Defendants did not obtain express consent from Plaintiffs or Class Members to obtain or use their personal information for this purpose.

81.    As a direct and proximate result of the aforesaid acts and activities of Defendants,

Plaintiffs and Class Members have sustained harm including but not necessarily limited to, intrusion upon their seclusion, invasions of their privacy, the time wasted reviewing defendants' collection messages and the data and space used on their mobile devices.

82. As provided by the DPPA, Plaintiffs and the Class Members seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with DPPA's requirements; (iii) statutory damages of $2,500 for each violation of the DPPA pursuant to 18 U.S.C. § 2724(a) and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all those similarly situated, demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. For a declaration that Defendants' actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class.

E. For an order awarding injunctive and equitable relief including, inter alia: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members motor vehicle records, or to whomever the Court deems appropriate; (iii) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and, (iv) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

F.  For an award to Plaintiffs and the Class of their costs and expenses of this litigation;

G.  For an award to Plaintiffs and the Class for their reasonable attorneys' fees;

H.  An award to Class Members of damages, including but not limited to: compensatory, statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

I.  An award of statutory damages to the extent available;

J.  For pre-and post-judgment interest as allowed by law and

K.  For such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 16, 2024          Respectfully submitted,

By: _/s/ Samuel J. Strauss_
   Samuel J. Strauss
   Alex Phillips (*pro hac vice* anticipated)
   TURKE & STRAUSS LLP
   613 Williamson St., Suite 201
   Madison, Wisconsin 53703-3515
   Telephone: (608) 237-1775
   Facsimile: (608) 509-4423
   sam@turkestrauss.com
   alexp@turkestrauss.com

   Matthew J. Langley (ARDC No. 6337129)
   David S. Almeida (ARDC No. 6285557)
   Britany Kabakov (ARDC No. 6336126)
   ALMEIDA LAW GROUP LLC
   849 W. Webster Avenue
   Chicago, Illinois 60614
   (312) 576-3024
   matt@almeidalawgroup.com
   david@almeidalawgroup.com

   *Attorneys for Plaintiffs & Putative Class*