**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW STEGMEYER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 24-cv-00394 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ABM INDUSTRIES INCORPORATED, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Andrew Stegmeyer and Amanda Brinton have filed this putative class action

against Defendants ABM Industries Incorporated ("ABM"), FlashParking, Inc. ("FlashParking"),

and ParkPliant, LLC ("ParkPliant"), in connection with bills that Plaintiffs received in the mail

and via text message for parking at ABM's parking lot. Specifically, Plaintiffs allege that

Defendants intentionally obtained Plaintiffs' protected personal information from nonpublic

motor vehicle records for an impermissible purpose, in violation of the Driver's Privacy

Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.* Defendants have filed a motion to dismiss the

class action complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1).

(Dkt. No. 23.) For the reasons that follow, Defendants' motion is granted.

**BACKGROUND**

The complaint alleges as follows.

Defendant ABM is a publicly traded corporation that owns and operates parking lots

across the country. (Compl. ¶ 28, Dkt. No. 1.) To collect unpaid parking fees from its customers,

ABM employs license-plate recognition technology provided by Defendant FlashParking, a

parking technology company, to capture photographs of the license plates of each driver who

drives on and off ABM's parking lots. (*Id.* ¶ 4.) ABM and FlashParking then disclose the captured license plate numbers to Defendant ParkPliant, a company that specializes in providing parking compliance services, to obtain the drivers' vehicle registration information. (*Id.* ¶¶ 4, 36.) Acting together, and without the consent of the drivers, Defendants obtain the drivers' personal information, including their names, addresses, and telephone numbers, from nonpublic motor vehicle records. (*Id.* ¶ 5.) Defendants then disclose and use that personal information to send the drivers text messages "to which they did not consent" and to mail them "surprise bills they never consented to pay," "doubling, tripling and even quadrupling the charges within weeks of the initial demand." (*Id.* ¶ 6.)

One of the parking lots operated by ABM is adjacent to the Regal City North movie theater in Chicago, Illinois. (*Id.* ¶ 2.) For the past several years, the Regal City North parking lot was left open without a gate, and ABM did not charge a fee for parking there. (*Id.*) Although the parking lot remained ungated, a small sign at the parking lot's entrance informed drivers that, starting on February 1, 2023, they would need to use a mobile phone app or a kiosk in the movie theater to pay for parking. (*Id.*) However, Plaintiffs allege that "it would be easy for drivers to miss this sign." (*Id.*)

Plaintiffs Stegmeyer and Brinton each have parked at the Regal City North parking lot for numerous years, and for several years prior to June 2023, neither was charged for parking there. (*Id.* ¶¶ 44, 50.) Then, in June 2023, each Plaintiff parked individually at the parking lot, with neither seeing a warning that they would need to pay a fee or otherwise receiving "any reasonable notice" that they would be charged for parking there. (*Id.* ¶¶ 45, 51.) Months later, Stegmeyer received a collection notice in the mail at his home address from ABM, which claimed that he owed $60 in parking fees. (*Id.* ¶ 46.) He later received several follow-up letters in

the mail, claiming that his fees had more than quadrupled to $260 and threatening to report him to collections if he did not pay. (*Id.*)

Likewise, days after parking at the Regal City North parking lot in June 2023, Brinton received text messages from ABM, claiming that she owed $80 in parking fees. (*Id.* ¶ 52.) The text messages included a link leading to a webpage with information about the parking fees, ABM's logo, and Brinton's license plate number, as well as photographs of her vehicle and license plate. (*Id.* ¶¶ 52–54.) Brinton also received two follow-up letters mailed to her home address from ABM and a law firm. (*Id.* ¶¶ 55–56.) The first letter doubled her fees to $160 and threatened to report her to collections if she did not pay. (*Id.* ¶ 55.) The second letter increased her fees to $240 and threatened to take further action if she did not pay. (*Id.* ¶ 56.)

The letters mailed to Stegmeyer and Brinton included their names, addresses, license plate numbers, and the makes of their motor vehicles. (*Id.* ¶¶ 47, 57.) Moreover, the letters identified the Regal City North parking lot as the location where each incurred their parking fees and included a picture of the rears of their motor vehicles taken at the entrance of the parking lot that clearly displayed their license plates and license plate numbers. (*Id.* ¶¶ 47, 57.) Neither Plaintiff provided Defendants with the information needed to identify them by name and address, and Brinton did not provide Defendants with her telephone number. (*Id.* ¶¶ 48, 58.) Defendants did not obtain express consent from Plaintiffs to obtain their personal information for the purpose of charging them for parking. (*Id.* ¶¶ 43, 49, 80.) Likewise, Plaintiffs did not consent to pay the bills. (*Id.* ¶¶ 6, 43, 49.) They allege that the letters and text messages acted as an intrusion upon their seclusion and an invasion of their privacy, and caused them great distress. (*Id.* ¶¶ 48, 58.)

In sum, Plaintiffs allege that Defendants have obtained, used, and disclosed their and the putative class members' personal information in violation of the DPPA. (*Id.* ¶¶ 5, 6.) Due to

3

Defendants' conduct, Plaintiffs and the putative class members have sustained harm "including but not necessarily limited to, intrusion upon their seclusion, invasions of their privacy, the time wasted reviewing [D]efendants' collection messages and the data and space used on their mobile devices." (*Id.* ¶ 81.)

Plaintiffs seek to bring this action on behalf of themselves and a putative nationwide class defined as follows: "All individuals residing in the United States who had their personal motor vehicle records, maintained by a State Motor Vehicle Department, directly obtained, used, redisclosed and/or resold by Defendants for purposes not permitted by the DPPA." (*Id.* ¶ 60.)

## DISCUSSION

When evaluating a Rule 12(b)(1) motion to dismiss, the Court first considers whether Defendants have raised a factual or facial challenge to subject-matter jurisdiction. *Boldt v. Jaddou*, 652 F. Supp. 3d 937, 939 (N.D. Ill. 2023) (citing *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015)). "A facial challenge looks to the allegations of the complaint, but a factual challenge looks to the evidence." *Bueno v. Experian Info. Sols., Inc.*, No. 22-cv-617, 2024 WL 4378526, at *4 (N.D. Ill. Sept. 27, 2024) (citing *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)). Specifically, a factual challenge occurs where "the complaint is formally sufficient but the contention is that there is in fact no subject[-]matter jurisdiction," such that the Court may look beyond the complaint and consider evidence as to whether subject-matter jurisdiction exists. *Apex Digit.*, 572 F.3d at 444. Here, however, Defendants raise a facial challenge, which requires "only that the [C]ourt look to the complaint and see if [Plaintiffs] ha[ve] sufficiently alleged a basis [for] subject[-]matter jurisdiction." *Id.* at 443. The standard for facial challenges under Rule 12(b)(1) is the same as the standard used to evaluate Rule 12(b)(6) motions. *Silha*, 807 F.3d at 174. Thus, the Court accepts all well-pleaded allegations in the

complaint as true and draws all reasonable inferences in Plaintiffs' favor. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

Defendants seek dismissal based on Plaintiff's lack of Article III standing. Article III of the United States Constitution limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. III, § 2. "A plaintiff must establish standing to sue as part of the case-or-controversy limitation." *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 637 (7th Cir. 2023). As a doctrine, standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Three elements constitute the "irreducible constitutional minimum" of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, "a plaintiff must have (1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by judicial relief." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022) (citing *Lujan*, 504 U.S. at 560–61). Where a plaintiff lacks Article III standing, a federal district court lacks subject-matter jurisdiction to hear his or her claims. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Defendants' motion challenges the first element of standing—injury in fact.

Plaintiffs have sued Defendants for alleged violations of the DPPA. Enacted in 1994, the DPPA "establishes a regulatory scheme that restricts the States' ability to disclose a driver's personal information without the driver's consent." *Maracich v. Spears*, 570 U.S. 48, 57 (2013). The DPPA provides, in relevant part, that a state department of motor vehicles ("DMV") "shall not knowingly disclose or otherwise make available to any person or entity . . . personal information." 18 U.S.C. § 2721(a). The statute defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver

identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." *Id.* § 2725(3). Under the DPPA, it is unlawful "for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under [the statute]." *Id.* § 2722(a). Identifying fourteen permissible uses, *see id.* § 2721(b), the DPPA creates a private right of action for "the individual" whose personal information was "knowingly obtain[ed], disclose[d] or use[d]" by another person "for a purpose not permitted" under the statute, *id.* § 2724(a).

Here, Defendants contend that Plaintiffs lack standing to bring their DPPA claims because they fail to plead a cognizable injury in fact. To support standing, "an injury must be concrete; that is, it must be 'real, and not abstract.'" *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 667 (7th Cir. 2021) (quoting *Spokeo*, 578 U.S. at 340). "Though 'traditional tangible harms, such as physical harms and monetary harms,' most readily qualify as concrete injuries, 'various intangible harms can also be concrete.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). While "Congress has the power to define intangible harms as legal injuries for which a plaintiff can seek relief," it must do so "within the bounds of Article III," and even then, "not every statutory violation implicates an interest Congress sought to protect." *Id.* In other words, "a plaintiff cannot establish standing simply by pointing to a mere procedural violation of a statute." *Id.* at 668. Instead, a plaintiff "must show that the violation harmed or presented an appreciable risk of harm to the underlying concrete interest that Congress sought to protect." *Id.* (internal quotation marks omitted).

Where, as here, Plaintiffs allege harms including "intrusion upon their seclusion, invasions of their privacy, the time wasted reviewing [D]efendants' collection messages and the

6

data and space used on their mobile devices" (Compl. ¶ 81), the alleged harms are intangible in nature. Nowhere in the complaint do Plaintiffs allege that they paid the demanded parking fees, nor do Plaintiffs seek damages in return for any such payments. Rather, the complaint's request for monetary relief encompasses statutory damages available under the DPPA and litigation expenses associated with bringing this action. Overall, the alleged harms here are limited to the receipt of unwanted letters and text messages. Where a plaintiff has received unwanted letters or text messages, the Seventh Circuit has generally applied an intangible-harm analysis to consider the potential harm. *See, e.g.*, *Pucillo*, 66 F.4th at 638–39 (treating the receipt of two unwanted collection letters about a debt discharged in bankruptcy as an intangible harm); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (same with respect to unwanted text messages). This Court follows the same approach.

To determine whether an intangible harm is concrete, courts must "look to both history and Congress's judgment." *Pucillo*, 66 F.4th at 639. Starting first with history, the Court "look[s] for a common law analog to determine whether an alleged injury has 'a close relationship to a harm traditionally recognized as providing a basis for lawsuits in American courts,'" but the Court need not identify an "exact duplicate." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) (quoting *Ramirez*, 594 U.S. at 424); *id.* at 1192 n.3.

Here, Plaintiffs allege invasions of their privacy and intrusion upon their seclusion. As the Seventh Circuit observed in *Persinger* and reiterated in *Pucillo*, "the tort of invasion of privacy encompassed four theories of wrongdoing: intrusion upon seclusion, appropriation of a person's name or likeness, publicity given to private life, and publicity placing a person in a false light." *Pucillo*, 66 F.4th at 639–40 (internal quotation marks omitted). Although Plaintiffs' complaint refers to invasion of privacy and intrusion upon seclusion as distinct harms, the Court

focuses its analysis on intrusion upon seclusion, the most suitable analog here. *See Pucillo*, 66 F.4th at 640 (considering intrusion upon seclusion where it was "the most apt of the invasion of privacy 'theories'"); *see also Persinger*, 20 F.4th at 1192 (observing that intrusion upon seclusion was "the best comparator"). Intrusion upon seclusion "occurs when a person intrudes upon the solicitude or seclusion of another or his private affairs or concerns" and such an intrusion "would be highly offensive to a reasonable person." *Pucillo*, 66 F.4th at 640 (internal quotation marks omitted). For example, "opening [a person's] private and personal mail, searching his safe or his wallet, [or] examining his private bank account" may constitute an intrusion upon seclusion. *Persinger*, 20 F.4th at 1192. Here, the Court finds that Defendants' conduct does not amount to an intrusion upon Plaintiffs' seclusion.

To argue otherwise, Plaintiffs point to the Seventh Circuit's opinion in *Baysal v. Midvale Indemnity Co.*, where the Seventh Circuit found that the defendants' disclosure of the plaintiffs' drivers' license numbers did not constitute an injury analogous to intrusion upon seclusion. 78 F.4th 976, 980 (7th Cir. 2023). Finding standing lacking, the *Baysal* court distinguished the facts of the case from *Garey*, where the Fourth Circuit found standing because the plaintiffs "alleged that the defendants disclosed, not license numbers, but home addresses, which attorneys then used to send unsolicited ads." *Id.* at 980 (citing *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022)). According to Plaintiffs, *Baysal* instructs that the disclosure and use of home addresses, as opposed to drivers' license numbers, provides standing. However, Plaintiffs' reading of *Baysal* is misguided. The disclosure and use of home addresses alone does not automatically grant standing. Rather, *Baysal* suggests that the disclosure of home addresses ***may*** constitute an intrusion upon seclusion where, for instance, that information is used "to send unsolicited ads, . . . . [a]s in junkfax and robocall cases." *Id.* at 980. Here, however, Defendants

8

did not obtain and then use Plaintiffs' home addresses to engage in unsolicited marketing and advertising.

Looking to *Baysal*, this Court's analysis does not rely on the ***type*** of personal information alone—specifically, names and home addresses—but ***how*** that information was used—namely, to collect unpaid debts. As the *Baysal* court explained, "[m]any people . . . know the numbers on strangers' licenses," as they are "neutral fact[s] derived from a public records system" and not "unique personal identifiers" like Social Security numbers. *Baysal*, 78 F.4th at 979–80. The same can be said for names and home addresses, which are often more publicly known than drivers' license numbers. More importantly, however, receiving unwanted bills in the mail is not akin to receiving unsolicited advertisements, the latter of which courts traditionally recognize as an intrusion upon seclusion. Although Plaintiffs received "surprise bills" in the mail (Compl. ¶¶ 6, 8), "there is nothing inherently bothersome, intrusive, or invasive about a [debt] collection letter delivered via U.S. Mail." *Pucillo*, 66. F.4th 634. While Plaintiffs allege that the bills themselves were unsolicited, in the sense that Plaintiffs did not consent to receive them, Plaintiffs do not go so far as to allege that the demanded payments were invalid. Despite Plaintiffs' frustrations with Defendants' practices, receiving letters in the mail for unpaid bills would not be highly offensive to a reasonable person.

As for the text messages Brinton received, but Stegmeyer did not, the Seventh Circuit has held that unwanted text messages "can constitute a concrete injury-in-fact for Article III purposes." *Gadelhak*, 950 F.3d at 463. In *Gadelhak*, however, the plaintiff received five text messages from a phone service for which he was not a customer, with survey questions in a language that he did not speak. *Id.* at 460. Although the plaintiff's receipt of the unwanted text messages in *Gadelhak* was analogous to an intrusion upon seclusion, the same cannot be said for

9

the two text messages that Brinton received, which were lesser in number and specifically tailored to Brinton, a customer who parked on ABM's parking lot.

Moreover, Plaintiffs allege that the unwanted letters and text messages caused them "great anxiety and distress." (Compl. ¶ 56; *see also id.* ¶ 48.) To the extent Plaintiffs rely on their emotional distress to secure standing, the Seventh Circuit has held that "worry and anxiety are not the kind of concrete injury essential to standing." *Baysal*, 78 F.4th at 977; *see also Wadsworth*, 12 F.4th at 668 ("[A]nxiety and embarrassment are not injuries in fact. Indeed, we have expressly rejected 'stress' as constituting concrete injury."). Insofar as Plaintiffs allege emotional distress to further their intrusion-upon-seclusion claim, that, too, is insufficient. *See Pucillo*, 66 F.4th at 640 ("Intrusion upon seclusion requires more than just an emotional response—it requires a particular kind of offensive intrusion."). Without more, Plaintiffs' emotional distress is not enough to warrant standing.

After considering history, the Court looks to Congress's judgment as part of its intangible-harm analysis. "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important for determining whether an intangible harm constitutes injury in fact." *Pucillo*, 66 F.4th at 641. Relevant here, the enactment of the DPPA "responded to at least two concerns over the personal information contained in state motor vehicle records." *Maracich*, 570 U.S. at 57. The first concern related to the "growing threat from stalkers and criminals who could acquire personal information from state DMVs." *Id.* The second concern arose from "the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation." *Id.* By enacting the DPPA, Congress "chose to protect individual privacy." *Id.* at 67.

10

Regarding the first concern, Congress sought to protect individual privacy to the extent necessary to protect individual safety. Where, as here, Plaintiffs have not alleged that Defendants' possession of their personal information threatens their individual safety, the first concern is not at issue. Likewise, Plaintiffs' allegations do not speak to the second concern because, as discussed, receiving communications for unpaid bills is not analogous to receiving unsolicited advertisements. Congress's judgment favors this Court's view that Plaintiffs lack standing.

Although Plaintiffs have not pleaded an injury in fact, the Court recognizes that other factual scenarios might warrant standing. For instance, had Plaintiffs alleged that their personal information was obtained as part of an extortionate parking scheme, whereby Defendants tricked them into parking on Defendants' parking lots and then obtained Plaintiffs' personal information to coerce them into paying fees that they did not owe, the Court's standing analysis would likely be different. Here, however, Plaintiffs have not alleged that the disclosure of their personal information was connected to the harm of being pressured or manipulated into paying an illegal parking bill. Similarly, the standing analysis would likely differ had Plaintiffs alleged that they acquired a home security system in response to Defendants' possession of their personal information. But under the factual allegations presented, Defendants' mere possession of Plaintiffs' personal information does not amount to an actual injury in fact.

### CONCLUSION

For the reasons stated, the Court finds that Plaintiffs have not met their burden of pleading injury in fact. Defendants' Rule 12(b)(1) motion to dismiss for lack of Article III standing (Dkt. No. 23) is therefore granted. The complaint is dismissed without prejudice. Plaintiffs are granted to leave to file an amended complaint that remedies the jurisdictional

deficiencies discussed herein by April 20, 2026. If Plaintiffs decline the opportunity to file an

amended complaint by April 20, 2026, the Court will enter final judgment in favor of

Defendants.

ENTERED:

Dated:  March 30, 2026

_____

Andrea R. Wood
United States District Judge